IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.                                                                    Criminal Action No. 2:22cr82

JOHN STUART MANCOLL,
                          Defendant.

## OPINION

This matter comes before the Court on the defendant's motion to suppress evidence. (ECF No. 15.)  The defendant, John Stuart Mancoll ("Mancoll"), moves to suppress statements and evidence that resulted from an August 18, 2021, traffic stop.   He argues the Court should suppress the statements and evidence because (1) Virginia Beach Police Department ("VBPD") officers conducted an unlawful traffic stop; (2) the officers illegally prolonged the traffic stop; (3) the officers did not give Mancoll his *Miranda* warnings when they handcuffed him; and (4) he did not voluntarily consent to the search of his medical practice.  On December 2, 2022, the Court conducted a hearing (the "hearing") on the defendant's motion.  At the hearing, Mancoll conceded that he violated traffic laws and accordingly abandoned his first objection. The government represented that it would not seek to introduce statements Mancoll made when handcuffed, mooting Mancoll's third objection.  Finally, the Court found that Mancoll did voluntarily consent to VBPD's search of his medical practice.  The Court took under advisement Mancoll's sole surviving objection: that VBPD officers unlawfully prolonged the traffic stop. Because the VBPD did not unlawfully prolong the traffic stop, the Court will deny the defendant's motion.

## I. <u>BACKGROUND</u>

Mancoll practices medicine in Virginia Beach.  On May 15, 2021, one of Mancoll's patients contacted the VBPD to report that Mancoll had stolen her prescription painkillers during an office visit the previous day.  VBPD's investigation revealed multiple instances in which Mancoll allegedly stole prescription painkillers from patients and may have used these painkillers during surgery.[1]  On August 18, 2021, Davis asked for assistance in conducting a traffic stop if officers observed Mancoll committing a traffic offense.  The obvious reason for this requested pretextual stop was to allow the police to confront Mancoll and search his car.  At Davis's request, Officers Rachel Nash ("Nash") and Christopher Daley ("Daley") followed Mancoll and observed him "cross a yellow lane line, ... touch a dotted lane divider several times, and then on a third road, saw him cause a near-collision after he drifted into another lane occupied by a large pickup truck." (*Id.* at 4.)  Nash pulled Mancoll over on a well-traveled road, told him what she had just seen, and asked for his license and registration.  She then entered his information into her computer and filled out an information sheet.  This took about seven minutes.  Meanwhile, Daley spoke with Mancoll.  During the conversation, Daley felt that Mancoll did not show signs of impairment.  He did not tell Nash.  Nash then returned to the defendant's car and asked him if he had been drinking and whether he had taken any prescription

---

[1] During VBPD's investigation of Mancoll, Detective Eileen Davis ("Davis"), a VBPD detective who also works with the Drug Enforcement Agency ("DEA") as a task force officer, interviewed an employee who reported that "she observed the defendant stealing his patients' prescription medications and possibly using them in the middle of surgeries.  The employee also confirmed that the defendant would direct his patients to bring in their prescriptions on the day of their surgery, and that he would direct his patients to return any unused prescription medications to the practice." (ECF No. 25, at 3.)  The government notes "[t]his is a violation of DEA regulations, which the defendant was obligated to comply with as a DEA registrant authorized to prescribe medications. 21 C.F.R. § 1317.40." (*Id.*)

2

medication.  Mancoll denied drinking and told Nash he took Allopurinol.[2]   Nash told Mancoll

that she "noticed his eyes were bloodshot," and he explained that he had used magnifying glasses

while in surgery that day.  (*Id.*)  Nash then asked Mancoll if he had anything illegal in the car and

whether she could "check his car to make sure he [did not] have anything."  (*Id.* at 6.)  Mancoll

consented to the search of his car, telling Nash that the officers were "more than welcome to"

search his car.  (*Id.*)   In the car, VBPD officers found Allopurinol and a prescription bottle

"which bore a prescription for a combination of oxycodone and acetaminophen" but contained

"multiple different schedule II controlled substances, none of which matched the prescription."

(*Id.*)

## II. RELEVANT LAW

### *A. Motion to Suppress*

"As a general rule, the burden of proof is on the defendant who seeks to suppress the

evidence."  *United States v. Seerden*, 264 F. Supp. 3d 703, 708 (E.D. Va. 2017); *see also United*

*States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981) (explaining that "t[]he proponent of a

motion to suppress has the burden of establishing that his own Fourth Amendment rights were

violated by the challenged search or seizure") (internal quotation omitted).  "Once the defendant

establishes a basis for his motion to suppress, the burden shifts to the government to prove, by a

preponderance of the evidence, that the challenged evidence is admissible."  *Seerden*, 264 F.

Supp. 3d. at 708.  "[T]he controlling burden of proof at suppression hearings should impose no

greater burden than proof by a preponderance of the evidence."  *United States v. Matlock*, 415

U.S. 164, 177 n.14 (1974).  "At a hearing on a motion to suppress, the credibility of the

---

[2] "Allopurinol is a non-opioid, prescription medication used to treat gout, among other things."  (*Id.* at 5.)

3

witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Gualtero*, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (quoting *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir.1993)).

### B. Duration of a Traffic Stop

The constitutionally tolerable duration of a traffic stop includes only the time necessary to address traffic violations and to attend to related safety concerns. *United States v. Rodriguez*, 575 U.S. 348, 354 (2015). "If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). "During a routine traffic stop, an officer 'may request a driver's license and vehicle registration, run a computer check, and issue a citation.'" *United States v. Green*, 740 F.3d 275, 280 (4th Cir. 2014) (quoting *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Rodriguez*, 575 U.S. at 354. Unrelated checks do not violate the Fourth Amendment so long as these checks do not prolong the stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. "[T]o extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess 'reasonable suspicion or receive the driver's consent.'" *United States v. Williams*, 808 F.3d 238, 245–46 (4th Cir. 2015) (quoting *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011)). "A reasonable suspicion exists when law enforcement officers possess 'a particularized and objective basis for suspecting the person stopped of criminal activity.'"

*United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

When an officer asks a question "during a lawful stop and d[oes not] prolong the stop, it passes constitutional muster under *Rodriguez* even if it exceeded the scope of the stop's mission." *United States v. Buzzard*, 1 F.4th 198, 204 (4th Cir. 2021). Courts do not require officers to conduct their stops as efficiently as possible. *See United States v. Perez*, 30 F.4th 369, 376 (4th Cir. 2022) ("In sum, though the stop could have been shorter (and begun more efficiently), it wasn't impermissibly prolonged."). Instead, courts must consider "what the officer actually did and how he did it." *Rodriguez*, 575 U.S. at 357 (rejecting the government's argument that "by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation").

"[T]he Supreme Court's decision in *Rodriguez* does not require courts to second-guess the logistical choices and actions of a police officer that, individually and collectively, were completed diligently within the confines of a lawful traffic stop." *United States v. Hill*, 852 F.3d 377, 384 (4th Cir. 2017). When "the evidence shows that the officers acted with reasonable diligence in executing the tasks incident to the traffic stop, and the stop was not impermissibly expanded in scope or time beyond the pursuit of the stop's mission, the district court [does] not err in denying [the] motion to suppress." *Id.*

### C. Reasonable Suspicion

"To show the existence of reasonable suspicion, 'a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot.'" *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (quoting *Branch*, 537 F.3d at 336). "In reviewing police action, courts must look at whether the

evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'" *Id.* (quoting *Branch*, 537 F.3d at 336–37). Courts do not require an officer to accept at face value every explanation or answer a suspect gives. The Supreme Court "ha[s] consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette v. California*, 572 U.S. 393, 403 (2014) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). Officers must distinguish between the reasonable and the plausible. "Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers." *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

## III. DISCUSSION

Mancoll moves the Court to suppress evidence found in the search of his car because VBPD officers unlawfully prolonged the stop in violation of his Fourth Amendment rights. When Nash asked for his consent to the search, the defendant argues that the stop had concluded or reasonably should have concluded. Because Nash had not yet returned his license and registration, he asserts that she held him in "investigatory detention," and he could not voluntarily consent to the search. (ECF No. 16, at 10–12.) Mancoll argues that the request itself constituted an unlawfully prolonging of the stop, and that *Rodriguez* prohibits even *de minimis* prolonging of a traffic stop. Mancoll's arguments rests on two assumptions. First, Nash had concluded the stop, or reasonably should have concluded the stop, before she asked for consent. Second, Nash did not have reasonable suspicion of a crime.

## A. Rodriguez

In *Rodriguez*, the government conceded that the officer had completed the stop and written Rodriguez a ticket before he asked for Rodriguez's consent to search his car using a K-9 unit. Rodriguez refused. The officer conducted the search without consent, detaining Rodriguez for another seven to eight minutes. The government argued that the additional seven to eight minutes' detention constituted a mere *de minimis* extension of the stop. The Court disagreed. *Rodriguez* focused the constitutional inquiry "not [on] whether the dog sniff occurs before or after the officer issues a ticket ... but whether conducting the sniff prolongs – *i.e.*, adds time to – the stop." *Rodriguez*, 575 U.S. at 357 (internal quotations omitted). The Fourth Amendment permits *de minimis* extensions when necessary for officer or highway safety, but "[h]ighway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id.* at 356–57 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977)). The *Rodriguez* Court did not address, and consequently did not decide, "whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation." *Id.* at 358.

### B. Mancoll's Assumptions

#### 1. *Whether the Traffic Stop Concluded (or Reasonably Should Have Been Concluded) When Nash Asked for Mancoll's Consent to Search the Car*

When Nash asked for consent to search the car, she had not concluded the stop. Nash pulled Mancoll over for failing to maintain his lane. She also suspected him of driving under the influence. When she asked for his consent to the search, she had observed Mancoll for a short time. She had checked his license and registration in the computer but had not yet conducted field sobriety tests. Although Daley spoke with Mancoll while Nash entered his information into

her computer and did not believe Mancoll appeared impaired, he did not share his assessment with Nash when she returned.  (Tr. 46:21–23; 68:1–2.)

Mancoll argues that Nash's request for his consent to the search impermissibly prolonged the traffic stop because the request had nothing to do with why Nash pulled him over (failure to maintain his lane).[3]  Daley testified that by the time he told Detective Weeks or Davis "[w]e really don't have much," he had "talked to Dr. Mancoll for several minutes.  There was no indication that he was impaired at that point." (Tr. 46:11; 46:21–23.)  At the hearing, Mancoll's counsel pointed to Daley's testimony as proof the stop had concluded, apparently arguing that Nash should have reasonably concluded the stop before asking for the consent search because *Daley* – not Nash – did not believe the defendant appeared impaired.

When Nash asked for the defendant's consent to search his car, she knew that (1) Davis had targeted him in a narcotics investigation; (2) he had violated multiple traffic laws by failing to maintain his lane and nearly causing an accident; and (3) he had bloodshot eyes.  She had observed him for less a minute.  Daley had not told Nash that he believed Mancoll did not show signs of impairment or that he believed "we really don't have much." (Tr. 68:1–2; 46:11.)  Furthermore, Daley's remark that Davis wanted them to ask for a search accorded with the DUI checklist that VBPD officers use during such a stop.  The checklist includes a checkbox for search and does not mandate an order of operations for officers conducting a DUI stop.  Traffic stops investigating DUI necessarily implicate highway safety.  Without further investigation, Nash could not have reasonably or responsibly concluded that Mancoll posed no threat to highway safety.  (Tr. 19:10–20:12 (describing the additional investigation Nash had planned to undertake to determine whether Mancoll could safely return to the road).)  Accordingly, Nash

---

[3] Mancoll asserts that Davis ordered the consent search, but Daley testified at the hearing that he was "the one that originally said, 'We can ask for a consent search.'" (Tr. 68:17–18.)

had not (and could not reasonably have) completed the traffic stop when she asked for Mancoll's consent to the search.

### 2. *Whether Nash Had Independent Reasonable Suspicion of a Crime*

Even if Nash's request for consent to search the car prolonged the stop, Nash acted lawfully because she had independent reasonable suspicion of a crime (driving under the influence). The Fourth Circuit permits "courts to credit the practical experience of officers who observe on a daily basis what transpires on the street" when analyzing the reasonableness of an officer's suspicion. *Branch*, 537 F.3d at 336–37 (internal quotation omitted). At the time of the stop, Nash had completed approximately 150–200 DUI stops and therefore had developed this "practical experience." *Id.*

Moreover, Nash followed Mancoll for "about four or five minutes" before pulling him over and had ample opportunity to observe his driving. (Tr. 13:11.)  Daley affirmed that Mancoll drove erratically: "I observed Dr. Mancoll failed to maintain his lane several times to the point where I thought to myself, is [Nash] going to stop the vehicle or not?" (Tr. 43:25–44:1–2.) At the outset of the stop, Nash observed Mancoll's bloodshot eyes, which she believed could indicate drug use. (Tr. 16:19–24.) These factors establish the "specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot." *Bowman*, 884 F.3d at 213 (internal quotation omitted).

Only with additional time did Daley's opinion of Mancoll's state of impairment change. Nash, busy performing the usual incidents of a traffic stop, did not have the same opportunity to observe Mancoll. Even if Daley *had* shared his assessment of Mancoll with her, as the lead officer on the stop, Nash had no obligation to credit Daley's assessment without further

9

investigation.    At the moment she asked for Mancoll's consent to the search, Nash had reasonable suspicion of a crime (driving under the influence).

## IV. CONCLUSION

VBPD officers did not unlawfully prolong the traffic stop to ask for his consent to search the car, and the search and seizure did not violate Mancoll's Fourth Amendment rights. Accordingly, the Court will deny the defendant's motion to suppress evidence.

The Court will issue an appropriate Order

Let the Clerk send a copy of this Opinion to all counsel of record.

/s/
John A. Gibney, Jr.
Senior United States District Judge

Date: 20 March 2023
Richmond, VA